## In re Douglas Maxwell LETLOW, Debtor.

### Scott Segell, Plaintiff,

v.

### Douglas Maxwell Letlow, Defendant.

Bankruptcy No. 05–82429.

Adversary No. 06–6220.

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Aug. 9, 2007.

---

Alan I. Seitman, Alan I. Seitman, Atlanta, GA, for Plaintiff.

Jerry A. Daniels, Jerry A. Daniels, LLC, Lawrenceville, GA, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES E. MASSEY, Bankruptcy Judge.

The Bankruptcy Code and Rules require a debtor to provide to the court and to creditors certain information about the debtor's financial history and to swear or

affirm that the information provided is true and correct to the best of the debtor's knowledge. Without complete, honest and accurate financial information about the financial condition of each debtor, bankruptcy courts cannot properly function. Similarly, a debtor has a duty to deal honestly with creditors and officers of the estate regarding the property of the debtor and of the bankruptcy estate. A breach of any of these duties may lead to denial of a debtor's discharge.

In this adversary proceeding, Plaintiff Scott Segell objects to Debtor and Defendant Douglas Letlow's discharge on three grounds. First, Plaintiff asserts that Defendant Letlow knowingly and fraudulently made false oaths in connection with this bankruptcy case. *See* 11 U.S.C. § 727(a)(4). Second, Plaintiff contends that within one year of the petition date Defendant transferred some of his property with the intent to hinder, delay, or defraud creditors. *See* 11 U.S.C. § 727(a)(2)(A). Finally, Plaintiff contends that Defendant with intent to hinder, delay or defraud a creditor or the trustee transferred or removed property of the estate after this case was filed. *See* 11 U.S.C. § 727(a)(2)(B). At trial, Plaintiff abandoned a fourth ground for objecting to Defendant's discharge as well as a claim that the debt owed by Defendant to Plaintiff is not dischargeable pursuant to 11 U.S.C. § 523(a)(2). The Court conducted the trial on March 8 and 9, 2007. Based on the evidence presented at the trial, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a), made applicable in adversary proceedings by Fed. R. Bankr.P. 7052.

## FINDINGS OF FACT

Douglas Letlow graduated from Auburn University with a business degree in 1988. Over the next 15 years, he worked several different jobs, primarily in sales. One of these jobs was with New York Life, where Letlow spent about a year in the mid-1990s selling life insurance policies to individuals.

In 2002, a business broker introduced Letlow to Scott Segell. Shortly after meeting, Letlow and Segell agreed to enter a business venture together and began evaluating potential opportunities. On April 15, 2003, they formed a company called Randal Maxwell Investments, LLC ("RMI") for the purpose of acquiring a business. Letlow served as CEO and Segell served as president of RMI. Each owned 50% of RMI's stock and made equal initial capital contributions.

After making unsuccessful attempts to buy two companies, RMI acquired the assets of Land Wizard, LLC, a commercial landscaping and holiday design business, on June 30, 2003. To finance this transaction, RMI borrowed $700,000 from a CIT company (perhaps CIT Small Business Lending Corporation, which is mentioned in an exhibit (Defendant's 60) that was not offered in evidence), and Letlow and Segell each guaranteed half of the CIT note and pledged their respective interests in their residences as collateral. To help finance RMI's operations, Letlow and Segell also personally guaranteed much of the company's trade debt and equipment leases and used personal credit cards to pay business expenses.

Letlow and Segell began quarreling over the business by late 2004. In November 2004, they reached a tentative agreement that Segell would buy Letlow's position in RMI, but this deal fell through the following February.

Unable to reconcile their differences, Letlow and Segell sold RMI to a third party on May 23, 2005. Although the evidence presented at trial does not show the

terms of this transaction, it is clear that the sale price did not satisfy the company's outstanding debt to CIT or result in relieving Letlow and Segell from liability on RMI debt. According to Letlow's Statement of Financial Affairs, he received $1 for his interest in RMI.

In mid–2005, Letlow sustained injuries in an auto accident. Partially disabled, he spent the latter half of 2005 selling dental equipment from his home. On October 14, 2005, Letlow filed a bankruptcy petition initiating case no. 05–82429.

### 1. *False Oaths.*

After obtaining an extension of time to file various documents, Defendant filed Schedules A through J and the Statement of Financial Affairs on November 18, 2005. Because he filed these documents over a month after his bankruptcy petition, Defendant had ample opportunity to consult with his attorney regarding the information provided in the schedules and to verify the accuracy of this information. At the end of the Schedules, he signed the required declaration stating that "I declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of 33 sheets … and that they are true and correct to the best of my knowledge, information, and belief." He signed a similar declaration for the Statement of Financial Affairs.

Plaintiff asserts that Defendant knowingly and fraudulently misrepresented on Schedule B the extent of his interest in a brokerage account at A.G. Edwards & Sons, Inc., which Plaintiff's Exhibit 7 shows to be account no. 4091–1426 (hereinafter the "AGE Account"). (When the AGE Account was opened, its number was 105–314132–029; *see* Plaintiff's Exhibit 6.) The AGE Account had a value of $29,065.46 on the petition date. Defendant stated on Schedule B that he had a one-

half interest in that account and valued that interest at $14,500. Contrary to Defendant's statement on Schedule B, the AGE Account was opened and thereafter maintained as an individual account in Defendant's name alone.

Plaintiff further contends that Defendant knowingly and fraudulently misrepresented on Schedules B and C that the AGE Account was a retirement account that Defendant was entitled to exempt. Contrary to Defendant's statements on those Schedules, the AGE Account was not a retirement account and he was not entitled to exempt the value of that account.

Plaintiff also alleges that Defendant knowingly and fraudulently misrepresented the extent of his interest in life insurance disclosed in Schedule B, as amended. In his schedule B, Defendant represented that he alone owned the value of insurance issued by New York Life Insurance Company. In an amendment to Schedule B, he showed that he owned a one-half interest in that insurance. Consistent with the amendment to Schedule B, Defendant asserted that his wife owned a half interest in those policies. In fact, Defendant owned the policies, and his wife never had any interest in them.

Finally, Plaintiff asserts that Defendant knowingly and fraudulently made a false oath with respect to his Statement of Financial Affairs. Question 14, entitled "Property held for another person" states: "List all property owned by another person that the debtor holds or controls." Defendant responded, "None." In fact, he was the custodian of two bank accounts for his two children.

**A. *The AGE Account.*** On July 18, 2002, Mr. Letlow opened the AGE Account in his own name. William Hicks, Jr., the A.G. Edwards financial consultant who handled the Letlows' accounts, identified

Plaintiff's Exhibit 5 as the new account card for Mr. Letlow's account dated July 18, 2002. Mr. Hicks signed the card, and it indicates that the account was being opened as an individual and not a joint account. Mr. Hicks testified that the account was the only one in Mr. Letlow's name at his branch of A.G. Edwards, that it was never a retirement account and that it was never a joint account. On Schedule B, Defendant described that account as "1/2 AG Edwards Retirement account funded 100% by Wife from gifts from Wife's family." On or about July 18, 2002, Mrs. Letlow, Defendant's wife, had transferred approximately $85,000 in cash and securities into that account from her own account maintained at A.G. Edwards. There is no evidence that the Letlows intended to establish this account as a joint account but mistakenly opened it in Mr. Letlow's name. Nor is there any evidence to suggest that Defendant took any step at any time after that account was opened to add Mrs. Letlow's name to the account.

Mr. Hicks testified that for several years Mr. Letlow had a limited power of attorney over an A.G. Edwards account owned by Mrs. Letlow that allowed Mr. Letlow to make investment decisions. But under this power of attorney, Letlow was not able to withdraw funds or transfer assets from her account. He occasionally exercised the power of attorney to make trades in his wife's account through Mr. Hicks. By contrast, there is no evidence that Mrs. Letlow had any ability to trade in the AGE Account. Nor is there any evidence that she ever had authority to withdraw assets from the AGE Account.

At the time he filed his Schedules, Defendant was well aware of the difference between a joint account and an individual account. On Schedule B, he disclosed that he had a one-half interest in three bank accounts and held two other brokerage accounts and a 401(k) account maintained at Vanguard solely in his own name.

In a personal financial statement dated March 17, 2005 that Mr. Letlow gave to Wachovia Bank (Plaintiff's Exhibit 17), he stated that he owned the AGE Account and two other brokerage accounts individually. Just above that representation, Letlow stated that he and his wife jointly owned two bank accounts, showing that he knew the difference between a joint account and an individual account at the time he delivered that financial statement. Letlow signed this personal financial statement below the words, "THE INFORMATION SET FORTH ABOVE IS TRUE AND CORRECT AND IS PROVIDED TO WACHOVIA BANK, N.A. FOR THE PURPOSE OF OBTAINING OR MAINTAINING CREDIT OR OTHER FINANCIAL ACCOMODATIONS [sic]."

At trial, Defendant testified that he believed that the AGE Account was a joint account because his wife transferred assets from her account at A.G. Edwards to the AGE Account when it was opened in 2002. Mr. Letlow's testimony about the extent of his interest in the AGE Account was not credible. The transfer by Mrs. Letlow of assets from her brokerage account to the AGE Account in 2002 was a gift, as Defendant acknowledged on Schedule B with respect to his alleged one-half interest.

On Schedules B and C, Defendant listed the AGE Account as a retirement account without any good faith legal or factual justification for doing so. Defendant claimed an exemption of $14,500.00 pursuant to Ga.Code Ann. § 18–4–22, which exempts from garnishment "[f]unds or benefits from a pension or retirement program as defined in 29 U.S.C. Section 1002(2)(A) or funds or benefits from an individual retirement account as defined in Section 408 or 408A of the United States Internal Revenue Code of 1986." Ga.Code Ann.

§ 18–4–22. The AGE Account did not qualify under either federal statute mentioned in this section, and neither Defendant nor his attorney made any effort at trial to argue otherwise. Exemptions of retirement accounts pursuant to section 522 of the Bankruptcy Code for a debtor domiciled in Georgia are governed by Ga. Code Ann. § 44–13–100(a)(2.1). Nothing in that subsection that permits a debtor to claim an exemption in a self-declared "retirement" account.

Defendant does not contend that when he opened the AGE Account, he told Mr. Hicks that he intended to open a "retirement" account. Defendant was surely familiar with the tax implications regarding qualified retirement accounts in October 2005 because he owned a Vanguard 401(k) account that he valued at $136,000 as of the petition date. Defendant, who was born in 1964 and has yet to reach 59 and a half years of age, testified that he never paid an early withdrawal penalty because of withdrawals from the AGE Account, further supporting the conclusion that he knew that the account had no special tax or other status.

Defendant did not treat the AGE Account as a retirement account prior to filing the Schedules. On the personal financial statement he gave to Wachovia Bank (Plaintiff's Exhibit 17), Defendant did not list that account as a retirement account. Instead, he included it in a schedule labeled "Cash." That financial statement contained a section for "IRA's, Keough's & Other Qualified Plans," but Defendant left this section blank, even though he had the 401(k) account with Vanguard at that time.

The disclosure of the AGE Account on Schedule B was in response to item 11 which asks for information about "Interests in IRA, ERISA, Keogh, or Other Pension or Profit Sharing Plans." Defen-

dant has not contended and cannot contend that the AGE Account was an IRA, ERISA-qualified account, Keogh plan or other pension or profit sharing plan. There is no line item on Schedule B for "retirement accounts."

Defendant had a motive to misrepresent that the AGE Account was jointly owned and that his interest was exempt. On October 14, 2005, after the bankruptcy petition had been filed, Mrs. Letlow withdrew a total of $13,715.45 from the two joint BB & T accounts and $11,789.73 from the joint Wachovia account, which accounts Debtor disclosed on Schedule B. She deposited those funds into an account in her name only at another bank because, she testified, she wanted to protect her money. Debtor has conceded that half of these funds belonged to him. Mrs. Letlow not disclose these transfers to the Trustee. These actions reflected her intense anxiety in October 2005 about the effect of the bankruptcy on her finances and the family, which her testimony at trial echoed. Mrs. Letlow had been clearly upset with her husband throughout the pendency of this case.

Defendant has been to a large degree dependent on his wife's assets and income since the beginning of 2005. The Court infers from the foregoing facts that one motive Defendant had to falsify his ownership interest in, and the nature of, the AGE Account was to reduce family pressure on himself by trying to shield the value in that account from the Trustee's grasp.

A related, though perhaps alternative, motive has to do with the precipitous drop in Defendant's income in 2005 compared to prior years. As shown in response to questions 1 and 2 on his Statement of Financial Affairs, Defendant had earned income of $82,000 and $70,123 in 2003 and 2004, respectively, and investment income

of $3,743 and $1,345 in 2003 and 2004, respectively. By contrast, he shows in response to the same questions that during 2005 to October 10, 2005, the petition date, he had earned only $4,800 and had additional disability income of only $11,980, making him dependent on his wife for the financial support of the family. Thus, Defendant's false statement that he held only a one-half interest in the AGE Account and that his interest was exempt may also have been motivated in part by his lack of income and perceived need for those funds in light of his diminished earnings.

Defendant holds a business degree, has been engaged in business for many years, created custodial accounts for his children, had regular, albeit infrequent contact with Mr. Hicks, who is a professional account representative, had a 401(k) retirement account, and listed the AGE Account as a cash account on a personal financial statement that he had represented was true only six months before he filed bankruptcy. The Court finds that Defendant's testimony concerning the AGE Account as a retirement account was completely false. Other than that testimony, there is not one iota of evidence to show that the AGE Account had anything to do with Defendant's or his wife's future retirement.

On February 9, 2006, Segell filed an objection to Defendant's claimed exemption of the AGE Account. The Trustee filed a similar objection on February 15, 2006. The Court entered two orders on March 24, 2006, disallowing the claimed exemption. On March 31, 2006, Defendant withdrew $29,599.83 from the AGE Account and disposed of the funds as follows. He paid $14,500.00 to the Trustee by a check dated April 10, 2006, transferred $14,500 to his wife and retained $599.83. (The increase in the value of the account since October 14, 2005 appears to have been the result of changes in the values of securities plus dividends.)

In a letter to Defendant's attorney dated September 26, 2006, counsel for the Trustee demanded that Defendant turn over, *inter alia*, funds representing the remaining balance of that account. (Plaintiff's Exhibit 30). The complaint initiating this adversary proceeding had been filed in March 2006 and specifically alleged that Defendant had fraudulently misrepresented the extent of his interest in the account. Yet, Defendant delayed until December 12, 2006 to send to the Trustee a check in the amount of $14,666.29 with respect to the funds he withdrew from the AGE Account in March 2006. That amount was $433.57 less than the amount Defendant received from that account after remitting the initial $14,500.00 to the Trustee in March 2006. Defendant has never amended Schedule B to correct the misrepresentations that he owned only a one-half interest in the AGE Account and that it was a "retirement" account.

**B. *The New York Life Policies.*** In his original Schedule B, Defendant's response to item 9, calling for information on interests in insurance policies, was "New York Life Insurance—approximation" with a value of $8,400.00. In the column in which joint interests or the interest of a particular spouse in a joint case would be disclosed, Defendant put a dash, indicating that the New York Life insurance interests were his property. He did not claim an exemption in that insurance on his initial Schedule C.

In an amendment to Schedules B and C filed on December 22, 2005, Defendant stated in part:

2. On Schedule B, Number 9, New York Life Insurance policy cash surrender value is approximately $9,800.00, with the Debtor's interest being $4,900.00.

3. On Schedule C, the Debtor exempts $1,537.50 of the Debtor's interest in the cash surrender value of the New York Life Insurance policy identified in Paragraph 9 of Schedule B pursuant to Ga.Code Ann. § 44–13–100(a)(6).

He claimed an exemption of $1,537.50 with respect to that insurance. Defendant signed the amendment below this statement: "I declare under penalty of perjury that I have read the foregoing and verify that it is true and correct to the best of my knowledge, information, and belief." In fact, on the petition date, Defendant owned two New York Life insurance policies having a cash value in excess of $9,000.

At the time he filed the Schedules, Defendant knew that his wife had no ownership interest in the policies. He sold the policies to himself while working as an agent for New York Life Insurance Company. Moreover, shortly before filing bankruptcy, Defendant received from New York Life a summary dated August 22, 2005 (Plaintiff's Exhibit 23) concerning one of the two policies and a letter dated September 1, 2005 (Plaintiff's Exhibit 22) concerning the other policy. Each of these documents stated the cash value of the respective policy. These documents are addressed only to Mr. Letlow. Mrs. Letlow is not mentioned in either document, and nothing in either one suggests joint ownership of the policies. Defendant stated on the personal financial statement that he gave to Wachovia Bank in March 2005 (Plaintiff's Exhibit 17) that he alone owned these policies.

In January and August 2006, long after he filed bankruptcy and without informing the Trustee, Defendant borrowed a total of $9,700 against the policies. Defendant presented no evidence to show that he paid any of the loan proceeds to his wife.

Defendant testified that he thought his wife owned half of the policies because she paid a portion of the premiums. That testimony was not credible. Defendant offered no evidence to show that the source of funds to pay the premiums came from his wife, and even if she did provide the money for payment of premiums, there is no credible evidence that Defendant transferred or intended to transfer any portion of his interest in those policies to his wife in exchange for premium payments. Accordingly, the Court finds that Defendant falsely swore that he owned these policies jointly with his wife in an attempt to shield one half of the cash value of the policies from the bankruptcy estate.

**C.** *The Custodial Accounts.* Question 14 of the Statement of Financial Affairs is entitled "Property held for another person" and prompts debtors to "[l]ist all property owned by another person that the debtor holds or controls." Defendant checked the box labeled "None" in response to this question despite the fact that he served as custodian with respect to two savings accounts, each titled in the name of one of his children.

The existence of these accounts was far from the back of Defendant's mind at the time he filed the Statement of Financial Affairs. In response to question 7, which covers gifts, Defendant listed two $11,000 transfers he made to the custodial accounts in late 2004. There is no evidence, however, other than the answer to question 14, on his Statement of Financial Affairs, to suggest that Defendant answered that question with intent to mislead the Trustee or creditors. Indeed, his answer to question 7 leads directly to his role as custodian for those accounts.

When asked at trial why he did not disclose these accounts in response to question 14, Defendant stated that he was unaware that serving as a custodian meant

that he held or controlled the accounts. Although this testimony was not entirely convincing, the Court cannot find that Defendant answered question 14 with fraudulent intent in light of the disclosures made in response to question 7.

### 2. *Pre-petition Fraudulent Transfers.*

On December 29, 2004, within one year of the petition date, Defendant made two transfers of $11,000 each from a joint checking account that he and his wife maintained at Wachovia Bank to the custodial accounts for his two children referred to above. The transfers were made by two checks signed by Defendant that posted on December 29, 2004. (Defendant's Exhibits 66, 67, and 68) (The Statement of Financial Affairs says that the transfers occurred in November but the two checks are dated December 28 and cleared on December 29.) At the same time, Mrs. Letlow also made two $11,000 transfers from the joint Wachovia account, one to each of the custodial accounts.

The custodial accounts into which these funds were deposited had been opened in May 2004. There is no evidence to show the balance in each of the custodial accounts on December 29, 2004. But the accounts contained balances of $26,211.27 (Defendant's Exhibit 66) and $31,463.93 (Defendant's Exhibit 67), respectively, as of May 5, 2005, when the balances in these accounts were withdrawn. There is no evidence of any other withdrawals from the accounts prior to their being closed. Thus, the accounts contained no more than $4,211.27 and $9,463.93, respectively prior to the deposits made by Defendant and his wife on December 29, 2004.

Defendant was in financial difficulty when he made these two transfers. On his Summary of Schedules, filed on November 18, 2005, Defendant averred that as of the petition date, his liabilities totaled $1,273,968.09 and the aggregate value of his interests in the assets disclosed was $732,341.50, leaving him with a negative net worth of $541,626.59. As already discussed, Defendant failed to include the full value of the AGE Account in his Schedules. Defendant overstated the value of his interest in his residence, which he showed on his Schedules was jointly owned. On Schedules A and D, he stated that the residence had a value of $528,500 and that the mortgage debt was $257,850, which translates into an equity of $270,650, but there is no dispute that these amounts reflect the full value of the residence and the full amount of the mortgage debt. (*See* Plaintiff's Exhibit 17). Hence, the Schedules overstate the value of Defendant's interest in the residence by $135,325. Adding the omitted value of the AGE Account to and subtracting the overstatement of his interest in the residence from the net worth shown in Defendant's summary of his Schedules further reduces his negative net worth as of the petition date to $662,452.59. (The actual negative net worth was almost certainly greater because Defendant listed the amounts of several debts on Schedule F as unknown.)

On the personal financial statement that Defendant filed with Wachovia on March 17, 2005, Defendant declared his total assets to be worth $807,682 and his liabilities to be $264,000, resulting in a positive net worth of $543,682. But this financial statement was also incorrect. On that statement, Defendant also included the full amount of equity in his residence (amounting to $238,000 based on a value of $500,000 and a mortgage debt of $262,000), though he showed that it was jointly owned with his wife. Defendant testified at trial that he was liable on RMI debt in 2004, but he omitted from the Wachovia financial statement more than $750,000 in debts related to RMI shown on Schedule

D. He also failed to include his § 401(k) account at Vanguard, which he valued as of October 14, 2005 at $136,000 as shown on his Schedule B. Adjusting his net worth shown on the Wachovia statement for the omitted liabilities, the overstatement of the interest in his residence and the omission of the Vanguard account would reduce his net worth shown on that statement to a negative $189,328.00.

On his Statement of Financial Affairs, Defendant did not list any payments to creditors or losses during the one year prior to the petition date. Additionally, he did not list any transfers during this period other than the sale of his interest in RMI, for which he indicated that he received $1 in exchange.

The Court infers that Defendant was in poor financial condition on December 29, 2004, if he was not insolvent on that date or rendered insolvent due to the transfers to his children. His testimony that he was in good financial condition in late 2004 was a conclusion based on balances in unspecified accounts and not on a sound analysis of the value of his assets and the amount of his liabilities. Hence, that testimony was not credible. Even if Defendant was not insolvent on December 29, 2004, his financial condition was deteriorating rapidly and he knew it. His primary source of income in 2004 had been RMI, and it was a failing business by the end of that year. Defendant did not list his interest in RMI as an asset on the financial statement given to Wachovia Bank. He testified that he ceased working for RMI in October 2004. Hence, in late December, 2004 Defendant had no regular income other than a relatively small amount of interest and dividends. From the beginning of 2005 to October 14, 2005, Defendant's income totaled only $18,012, including disability insurance payments of $11,980. Of the balance, he stated that he earned $1,232 in interest income, leaving only $4,800 from sales of dental equipment.

Defendant testified that he and his wife made the four $11,000 transfers for the purpose of college planning. But on each of the checks he signed, he wrote, "2004 Gift (Financial Planning)." The surrounding circumstances point to the conclusion that college planning was a mere pretext for an attempt to shield these funds from Debtor's creditors. Defendant earned less than $6,000 a month on average during 2004, had no means to pay all of the business debts he had incurred and was, if not insolvent, close to being insolvent by late December 2004. These transfers were not part of a regular series of substantial monetary gifts from the Letlows to their children. Rather, they dwarfed earlier deposits in these accounts. The transfers totaling $22,000 made by Defendant comprised more than 31% of his gross income in 2004 and exceeded his gross income through October 14 of 2005. Defendant's testimony that the transfers he made to his children were legitimate efforts to fund college educations lacked credibility, particularly when viewed in light of the financial difficulties he knew he was facing in late 2004. Based on this analysis, the Court infers that Defendant made these transfers with intent to defraud his creditors.

### 3. *Hindering and Delaying the Trustee.*

Post-petition, Defendant delayed for an inordinate amount of time turning over to the Trustee non-exempt funds from bank accounts, the proceeds he borrowed against the New York Life policies, and the funds in the AGE Account.

The assets shown in the table below are part of the property of Debtor's bankruptcy estate, according to Debtor's Schedule B, except that the value of the AGE Ac-

count includes the entire account and post-petition interest and dividends. The value of the New York Life policies is based on the amounts of loans Defendant took out on those policies in 2006.

| Asset | Value of Debtor's Interest | Exemption | Estate's Interest in Property |
|---|---|---|---|
| AGE Account (individual) | $29,599.83 | $ 0 | $29,599.83 |
| New York Life Policies (individual) | $ 9,700 | $1,537.50 | $ 8,162.50 |
| Bank of America Checking (individual) | $ 5,000 | $ 100 | $ 4,900 |
| BB & T checking (joint) | $ 6,500 | $ 789 | $ 5,711 |
| BB & T savings (joint) | $ 289 | $ 289 | $ 0 |
| Wachovia checking (joint) | $4,500 | $1,000 | $ 3,500 |

Despite the fact that these assets became property of the estate on October 14, 2005, Defendant delayed turning over this property to the Trustee for many months. Although Mrs. Letlow removed funds in the BB & T and Wachovia accounts shortly after the petition was filed, Defendant does not contend that his wife would not return the funds to him. He was in a position without depending on her to turn over the balance in the AGE Account and the value of the insurance policies.

On October 24, 2005, two weeks after filing his bankruptcy petition, Defendant withdrew $4,400 from the Bank of America checking account. He later claimed an exemption of only $100 in this account. It was not until January 26, 2006, over three months after his bankruptcy filing, that Defendant wrote checks to the Trustee totaling approximately $13,700.

On March 31, 2006, Defendant liquidated the AGE Account after the Court denied his attempt to exempt this property. From the $29,599.83 he withdrew from this account, he paid only $14,500 to the Trustee. He gave his wife $14,500 of the re-

maining balance in the AGE Account and retained $599.83. On or about December 12, 2006, Defendant finally wrote a check to the Trustee for $14,666.29, instead of the total of $15,099.83 that he might have turned over in March 2006, a shortfall of over $400.

In a letter dated September 25, 2006 (Plaintiff's Exhibit 30), counsel for the Trustee demanded that Defendant turn over an additional $35,668.20 in funds representing the remaining balance of the AGE Account, the non-exempt value of the loans against the New York Life policies, and other assets. In a letter dated January 23, 2007 (Plaintiff's Ex. 31), counsel for Defendant represented to counsel for the Trustee that Defendant had difficulties in liquidating the cash surrender value of life insurance policies. In January 2006 and again in August 2006, however, Defendant had already borrowed against the cash surrender value of his New York Life insurance policies and retained $9,700 in loan proceeds, even though he only exempted $1,537.50 from the estate. He admitted using these funds for living expenses.

Defendant's last payment to the Trustee, a check for $3,648.70 dated February 8, 2007, came just a month before the trial of this adversary proceeding. In short, Defendant delayed turning over property that he was well aware belonged to the estate over the course of this bankruptcy case and used those funds for his own purposes.

Defendant has offered no credible or cogent excuse for his improper exercise of control over estate assets or his failure to turn those assets over to the Trustee, especially for his delay in turning over funds after having received a written demand for that turnover. He knew full well that the assets were property of the estate. The Court infers that Defendant's purpose in

delay and in possibly retaining to this day some of the property of the estate was to prevent the Trustee and the estate from obtaining that property and thereby to gain illegal use and control of property of the estate in hopes that the Trustee would not pursue the estate's interest in that property.

## CONCLUSIONS OF LAW

The Court has jurisdiction over Defendant and the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1), and this matter constitutes a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(J).

Section 727 of the Bankruptcy Code provides in pertinent part that:

(a) The court shall grant the debtor a discharge, unless—

. . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

. . .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account[.]

11 U.S.C. § 727(a)(2) and (a)(4).

 Plaintiff has the burden of proof under section 727. Fed. R. Bankr.P. 4005. The elements of each objection to discharge must be proven by a preponder-

ance of the evidence. *Transp. Alliance Bank v. Owens (In re Owens)*, 2006 Bankr.LEXIS 2211, * 14 (Bankr.N.D.Ga. 2006); *see, e.g., In re Keeney*, 227 F.3d 679, 683 (6th Cir.2000). Additionally, "denial of a discharge is an extraordinary remedy and therefore, statutory exceptions to discharge must be construed liberally in favor of the debtor and strictly against the objecting party." *In re Matus*, 303 B.R. 660, 671 (Bankr.N.D.Ga.2004).

### 1. *Section 727(a)(4) claims.*

 All but one of the elements of a claim under this section are apparent on the face of the statute. The debtor must make under oath a false statement in or in connection with a bankruptcy case, knowing the statement to be false and having a fraudulent intent in making it. *In re Chalik*, 748 F.2d 616, 618 n. 2 (11th Cir.1984). The element of the claim not directly stated in section 727(a)(4) is that the statement must be material. *Swicegood v. Ginn*, 924 F.2d 230, 232 (11th Cir.1991) ("To justify denial of discharge under § 727(a)(4)(A), the false oath must be fraudulent and material."). "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Chalik*, 748 F.2d at 618.

 The plaintiff must prove actual and not constructive fraud. *Rogers v. Aiello (In re Aiello)*, 173 B.R. 254, 257 (Bankr.D.Conn.1994); *cf. Wines v. Wines (In re Wines)*, 997 F.2d 852, 856 (11th Cir.1993). "Fraudulent intent . . . may be established by circumstantial evidence, or by inferences drawn from a course of conduct." *Playnation Play Sys. v. Howard (In re Howard)*, 2004 Bankr.LEXIS 1804, *27 (Bankr.N.D.Ga.2004) *(quoting Farm-*

*ers Coop. Ass'n v. Strunk,* 671 F.2d 391, 395 (10th Cir.1982)). Reckless indifference to the truth satisfies the burden of showing the requisite intent to deceive. *Matter of Beaubouef,* 966 F.2d 174, 178 (5th Cir.1992); *Howard,* 2004 Bankr.LEXIS 1804 at *27. However, "[d]ischarge may not be denied where the untruth was the result of mistake or inadvertence." *Keefe v. Rudolph (In re Rudolph),* 233 Fed.Appx. 885, 889 (11th Cir.2007).

▓▓▓▓▓ Deliberate omissions from the schedules may constitute a false oath for purposes of this section. *Chalik,* 748 F.2d at 618 n. 3 ("A knowing and fraudulent omission from a sworn Statement of Affairs or schedule may constitute a false oath."). "A false oath or account is 'knowingly' false if the debtor knew the information omitted from the schedules should have been included but, for whatever reason, was not." *Am. Express Travel Related Servs. v. Scott (In re Scott),* 2004 WL 3623508, *4–5, 2004 Bankr.LEXIS 1830, *13 (Bankr.N.D.Ga.2004). Accordingly, "[a]n inadvertent omission or an omission resulting from an honest but erroneous belief that the information need not be disclosed" does not constitute a knowingly false omission. *Id.*

▓▓▓▓ Applying the law to the facts of this case, the Court holds that Plaintiff has proved by a preponderance of the evidence that Defendant knowingly and fraudulently made in connection with this case material statements under oath that were false. Defendant stated on his Schedule B filed on November 18, 2005 in response to the requirement of listing "Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans" that he held "1/2 AG Edwards Retirement account" with a value of "$14,500." That statement was false. Only Defendant had legal and equitable title to his individual account at A.G. Edwards, which was the AGE Account. No other person had any interest in that account. The value of the AGE Account on October 14, 2005 was slightly more than $29,000. It was an ordinary brokerage account and not a retirement account. Defendant falsely stated on Schedule C filed on November 18, 2007 that the AGE Account was a retirement account as to which he was entitled to claim an exemption.

Defendant falsely stated on the amendment to his Schedule B filed on December 22, 2007 that his interest in two New York Life insurance policies was $4,900, representing one half of the total cash value of those policies amounting to $9,800 disclosed on that amendment. Defendant was the sole owner of those policies. No other person had any interest in them. At the time he filed his Schedules and the amendment, Defendant knew that his wife had no interest in the AGE Account or the New York Life policies and that he alone owned the entire values of those assets. He falsely represented that he held only a one-half interest in these assets and falsely represented that the AGE Account was a retirement account in a fraudulent effort to hide from the Trustee and creditors the nature and extent of his interests in those properties. His treatment of these assets on the financial statement he gave to Wachovia Bank show convincingly that Schedules B and C contained materially false statements designed to mislead and that he knew the statements were false.

His failure to amend Schedules B and C promptly to reflect the truth, particularly after these false statements were called to his attention, supports the Court's inference of fraudulent intent. *In re Searles,* 317 B.R. 368, 377 (9th Cir. BAP 2004).

Even if there were evidence overlooked by the Court that would raise a question about the deliberate and fraudulent conduct of Defendant in concealing the true nature and extent of his interests in the

AGE Account and the New York Life insurance policies, Defendant cannot escape the consequence of his conduct that at the very least constituted a reckless disregard for the truth, which is the equivalent of fraud for the purposes of section 727(a)(4).

Based on these findings of fact and conclusions of law, Debtor and Defendant is not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(4).

### 2. *Section 727(a)(2) Claims.*

 In order to prevail under section 727(a)(2)(A), a plaintiff must prove by a preponderance of ·the evidence: (1) a transfer or concealment of property of the debtor or the estate, (2) with actual intent to hinder, delay, or defraud a creditor (3) within one year before the filing the petition. *In re Parnes*, 200 B.R. 710, 713 (Bankr.N.D.Ga.1996). Constructive fraud is insufficient to support a denial of discharge under this section. *Id.*

 To determine if a debtor acted with fraudulent intent, courts typically consider whether any badges of fraud are present under the circumstances. Common badges of fraud include:

(1) the lack or inadequacy of consideration;

(2) the family, friendship or close associate relationship between the parties;

(3) the retention of possession, benefit or use of the property in question;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

(5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

(6) the general chronology of the events and transactions under inquiry.

*In re Kaiser*, 722 F.2d 1574, 1582–83 (2d Cir.1983). *See also In re Matus*, 303 B.R. at 672–73.

 Plaintiff has proven by a preponderance of the evidence that Defendant made the two $11,000 transfers to his children within one year of the petition date with the requisite intent to defraud creditors. These transfers are marked by several badges of fraud that support the Court's inference of fraudulent intent. The transfers were gifts made to members of Defendant's immediate family at a time when Defendant was at worst insolvent and at best facing financial difficulty and the looming prospect of a worsening situation. As a custodian over the accounts to which these funds were deposited, Defendant maintained control over this property. The balances in the custodial accounts were withdrawn in May 2005, about four months after the transfers were made. The transfers made on December 29, 2004 were not part of a regular pattern of gifts to his children for the purpose of college planning. Rather, they stand out as by far the largest deposits made by Defendant into those accounts. Defendant's testimony that he made these transfers for purposes of funding his children's education was not credible. Accordingly, the Court concludes that Defendant is not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(2)(A).

 Plaintiff has also shown by a preponderance of the evidence that Defendant's transfer and removal of property of the estate post-petition warrants a denial of discharge pursuant to 11 U.S.C. § 727(a)(2)(B). The elements of this claim are (1) a transfer, removal or concealment of property of the estate (2) with intent to hinder, delay or defraud an officer of the estate.

Section 521(4) of the Bankruptcy Code places an affirmative duty on debtors to "surrender to the trustee all property of the estate." Plaintiff has proved by a preponderance of the evidence that Defendant delayed turning over funds to the Trustee that Defendant unequivocally knew belonged to the estate. Defendant decided to play out the hand he dealt himself by falsely asserting an interest in non-exempt assets and by simply failing to turn over non-exempt assets to the Trustee in the face of the demands by the Trustee. He used property of the estate that he had not claimed as exempt to pay personal expenses and liquidated estate property without court approval. Defendant has shown no credible factual basis and no sound legal basis for not turning over to the Trustee estate property in accordance with section 521(4) or for the delay in turning over estate property to the Trustee. Defendant's conduct, particularly after his having received the demand letter in September 2006, evidences his intent to hinder and delay the Trustee, an officer of the estate, in the exercise of the Trustee's duties to collect and liquidate property of the estate. Each instance in which Defendant delayed for months in turning over estate property to the Trustee based on Defendant's false theories of ownership or based on what may have been nothing more than a hope that the Trustee would lose interest supports the denial of discharge pursuant to 11 U.S.C. § 727(a)(2)(B). *See In re Searles,* 317 B.R. at 380 (discharge denied pursuant to 11 U.S.C. § 727(a)(2)(B) where debtor "engaged in prolonged warfare with the trustee resisting surrender of property that was unambiguously property of the estate.").

The Court will enter a separate judgment.